304 So.2d 765 (1974)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS
v.
ST. TAMMANY HOMESTEAD ASSOCIATION.
No. 9961.
Court of Appeal of Louisiana, First Circuit.
November 12, 1974.
Rehearing Denied December 16, 1974.
Writ Refused January 31, 1975.
*767 Alvin J. Liska, New Orleans, for appellant.
William J. Jones, Covington, for appellee.
Before LANDRY, BLANCHE and NEHRBASS, JJ.
LANDRY, Judge.
This expropriation proceeding had been consolidated with State of Louisiana, Through the Department of Highways v. Shell Oil Company, 304 So.2d 777, Number 9962, and State of Louisiana, Through the Department of Highways v. Gulf Oil Corporation, 304 So.2d 775, Number 9963, on the docket of this court. All cases arise from the taking by the Department of properties of defendant landowners required for construction of east-west Interstate Highway 12 (I-12), and the four-laning and improvement of U.S. Highway 190 (190), including a modified cloverleaf design overpass interchange at the intersection of said highways between Covington and the north approach to the Lake Ponchartrain Causeway at Chinchuba, St. Tammany Parish.
In each case, the Department appeals from judgment awarding the landowner values and severance damages based on enhanced valuation admittedly accruing from a taking in 1965 for the I-12 Project, which contemplated a diamond design interchange at the junction of the two roadways. The Department contends this present taking in 1971, for conversion of 190 from two to four lanes, with controlled access thereto from its intersection with I-12 South to Chinchuba at the intersection of Louisiana Highway 22 and the North approach to the Lake Ponchartrain Causeway, including a change from the diamond design to a modified cloverleaf design interchange, is part of the original project. On this basis, the Department argues that owners are not entitled to the enhanced value resulting from the initial project. In the case of St. Tammany Homestead Association (Homestead), the Department contends the lower court erroneously awarded damages for commercial value of property restricted to residential use at the time of taking, notwithstanding recordation of documents which allegedly removed said restrictions as of a fixed future date. In all three cases, the Department also complains of the awarding of values for the tracts taken based on an asserted time factor increase in value during the period 1968 to the date of taking in 1971. We affirm all judgments.
In 1963, 190 was a two-lane highway. In that year, the department, in compliance with Federal regulations, conducted open hearings to inform the public of the proposed location of I-12 in St. Tammany Parish, and the nature of the interchange to be constructed at the intersection of proposed I-12 and 190. The initial plan provided for a full interchange at the junction, but did not specify design. Department records of the initial public hearing on the "corridor" location of I-12 in St. Tammany Parish held February 24, 1963, *768 show only that a full interchange was proposed. Department construction plans and maps dated May 26, 1964, and February 8, 1965, respectively, reveal the interchange to be a full diamond interchange. Right of way maps prepared for the Department under date of June 7, 1965, also show the interchange to be the diamond design. On July 14, 1965, the Department officially authorized construction of numerous projects including State Project No. 454-04-02, Federal Aid Project No. I-12 1 (11) 62, which included the I-12U.S. 190 diamond interchange. Based on said plans, the Department, in 1965, purchased from willing owners the properties required to construct the proposed full diamond interchange at subject junction. One of said owners was Homestead which, in August, 1962, acquired a parcel of land situated at the corner of 190 and Ponchitowala Drive, a 100 foot wide street which connected 190 to Ponchitowala Subdivision, and which also dead ended on the east side of 190. Homestead's tract was situated on the south side of Ponchitowala Drive. Said parcel fronted 320 feet irregularly on the east side of 190 by a depth of 370 feet along the South side of Ponchitowala Drive and a depth of 350 feet along the south boundary. After selling to the Department in November, 1965, Homestead still owned 320 feet front on 190 by a depth of 290 feet along Ponchitowala Drive and a depth of 350 feet along its southern line. Said parcel, situated in the southeast quadrant of the proposed diamond interchange, constituted the "first off" site with direct access to 190.
On May 26, 1966, Homestead granted an option to Humble Oil Company (Humble) to purchase a rectangular portion of Homestead's tract measuring 215 feet front on 190 by a depth of 200 feet along Ponchitowala Drive, for the sum of $47,500.00. Said option was extended on November 16, 1966, February 28, 1967, and January 5, 1968, on which latter date the purchase price was increased to $75,000.00. Humble never exercised the option.
In this present opinion, we shall dispose of the issues common to all three consolidated cases together with those peculiar to the Homestead case. We shall render separate opinions in the Shell and Gulf cases limited solely to consideration of the appraisals therein.
After purchasing right of way for the diamond interchange, in 1965, the Department meanwhile began consideration of a project to widen 190 to four lanes, from the North Lake Ponchartrain Causeway approach at Chinchuba (where La. Hwy. 22 intersects U.S. 190), north to Covington. A public hearing on this proposed work was held in May, 1968, at which time local planning authorities urged the Department to consider controlled access on 190 from Chinchuba north to the intersection of I-12 and 190, as an adjunct to the improvement project on 190. The matter was taken under consideration by the Department, and at a hearing held in November, 1968, the Department announced plans to control access on 190, as recommended by local authorities and interests. The project for improving 190 was denominated Chinchuba-Covington Highway, Federal Aid No. F-76(14), Control of Access on U.S. 190 from La. Hwy. 22 to the Proposed I-12 Interchange.
It is conceded the decision to control access to 190 required a redesign of the full interchange at the junction of I-12 and 190, from a diamond to a modified cloverleaf design, including cloverleafs in both western quadrants of the intersection, and directional ramps in both eastern quadrants. This involved taking additional properties in all quadrants because the modified cloverleaf design interchange is more intricate than a diamond design. The record also shows that because the cloverleaf design interchange requires more property and is more costly to construct, the Department naturally avoids employing such a design whenever possible.
These condemnation proceedings were commenced in June, 1971, to acquire the *769 additional lands needed to construct the cloverleaf design interchange. The taking from Homestead is of an irregularly shaped parcel fronting 320 feet on the east side of the northbound lanes of 190, by a depth of 185 feet along its northern boundary (the south side of Ponchitowala Drive), and a depth of 264 feet along its southern boundary, containing 59,256 square feet. Homestead is left with a remainder of 251 feet fronting on and at the dead end of a service road paralleling 190. This remainder is 105 feet deep along Ponchitowala Drive and 86 feet in depth on its southern line. Access to 190 is now available only by means of the service road along which one must travel one mile south to the nearest interchange at Fairway Drive.

THE ENHANCED VALUE ISSUE
The Department contends that owners are not due the admitted enhanced value resulting from the initial taking because the alteration in interchange design, which necessitated this present taking, was a condemnation for one and the same project. Landowners concede that an owner is not entitled to the enhanced value of property taken where enhancement is occasioned by the improvement for which the property is condemned. However, landowners urge that the instant taking was not for the project which produced the enhanced value, but for an entirely separate and distinct improvement.
Ordinarily the value of property taken for public purposes is determined as of the time of taking and not as enhanced by the purpose for which it was condemned. State, Through Department of Highways v. Trippeer Realty Corporation, La., 276 So.2d 315.
However, where property was not included in the scope of a project from its beginning, and the project is later revised or enlarged to include that additional property, or if a subsequent expropriation was for a separate project or improvement, the landowner is entitled to the enhanced value of the property accruing because of its proximity to the initial work. State, Department of Highways v. Beatty, La.App., 288 So.2d 900; State, Department of Highways v. Boles, La.App., 240 So.2d 786; State, Department of Highways v. Martin, La.App., 196 So.2d 63.
The Department concedes the above rule, and also urges that the rule has been limited by United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, to the extent that if it is reasonably foreseeable that the original project will probably extend, or will probably be revised, enlarged or expanded to include the property subsequently taken, landowners are not entitled to the enhanced value resulting from the initial expropriation. The correlative of this rule is that if it was not reasonably foreseeable that the project would probably extend, or would probably be enlarged or expanded to include the property later taken, the owner is entitled to the enhanced value accruing by virtue of proximity to the original improvement. We cite approvingly 27 Am.Jur.2d Eminent Domain, § 284, pages 82-83, which defines the applicable rule as follows:
"Where a previously established project is to be extended or enlarged by condemnation of adjacent lands, the question whether the owner of the adjacent lands may recover as a part of his compensation the enhancement in the value of the land since the establishment of the original project is frequently made to depend upon the question whether, at the time of the construction of the original project, it was contemplated that the land in question would sooner or later be taken for the purposes of the project, or whether the taking of it was conceived, not as part of the original project, but as an independent enterprise subsequently undertaken in connection with the original project. In the former event, in analogy to the general rule that enhancement after a practical certainty that the project will include the land in question *770 is not a part of the market value of the land for which the owner is entitled to compensation, the courts have usually ruled that the owner of the land taken for the purpose of extending or enlarging the original project is not entitled to the enhancement in the value of the land due to the project. But where the taking of the land was not conceived as a part of the original project but as an independent enterprise subsequently undertaken in connection with the original project, in analogy to the view that enhancement prior to the determination of the location of a public improvement and the inclusion therein of the land in question is a part of the market value of the land for which the owner is entitled to compensation, the owner of land taken for the purpose of extending or enlarging the original project is entitled to the enhancement in the value of the land due to the improvement."
The record sustains the conclusion that the project for improvement of 190, initiated in 1968, was a separate and distinct work from the I-12 undertaking commenced in 1963. Although time alone is not the controlling factor, it is of some import that the first taking occurred in 1965, and the latter in 1971, six years later. Equally important, the Department's Interstate Engineer, Frank Heroy, Jr., testified unequivocally that the I-12 Project and the plan to improve 190 were separate works. Heroy also testified the planned diamond interchange was adequate for the original I-12 Project. According to Heroy, it was not reasonably foreseeable that the change in design would probably occur. He further stated that the decision to control access on 190 from I-12 south to Chinchuba made it absolutely necessary that the design be changed because two controlled access highways (I-12 and 190) could not physically be joined by a diamond interchange. Based on Heroy's testimony, we conclude there is no reasonable ground to find that the original project would probably extend, or would probably be revised, enlarged or expanded to include the subject properties. We reached a similar conclusion in Beatty, above, and in the recent cases of State, Department of Highways v. Covington Interstate, Inc., La.App., 295 So.2d 828, and State, Department of Highways v. Wax, La.App., 295 So.2d 833, which involved this same intersection. The record before us convinces us of the propriety of our former rulings on this issue. We find that the trial court properly held all landowners are entitled to the enhanced values resulting from the previous taking.

THE BUILDING RESTRICTIONS ON HOMESTEAD'S PROPERTY
The Department readily admits that the proposed diamond interchange rendered all subject properties highly desirable as prime service station sites much desired by major oil companies. The Department also admits that before the first taking, the Gulf and Shell tracts were best suited for highway commercial inasmuch as they had direct access to U.S. 190. Also, the Department acknowledged that but for building restrictions limiting Homestead's property to residential use, said tract would also have had a best and highest use as highway commercial because of its direct access to 190 and being situated at the intersection of Ponchitowala Drive. However, because of the restriction to residential use, the Department instructed its appraisers to value Homestead's property as having a residential best and highest use. Nevertheless, the Department's appraisers learned of the hereinafter discussed efforts of Homestead to remove the building restrictions governing the site, and on instruction from the Department's legal section, appraised said property as being best suited for commercial purposes. In each of these cases, on instruction from the Department, the state's appraisers valued subject tracts as commercial sites but without benefit of the enhanced value resulting from the initial taking. Because the state's appraisers ignored this prime evaluation *771 factor, the trial court rejected said appraisals as being of no practical value. In this conclusion, we concur. It appears that the Department pitched its case on this crucial point. Having lost the issue, the Department is in the position of having submitted the matter with no creditable appraisals on its behalf.
On November 6, 1959, building restrictions were recorded governing use of property in Ponchitowala Subdivision in which Homestead's property is situated. These regulations restrict use of the Homestead tract to residential purposes. On May 2, 1962, said restrictions were revised merely to revoke a required fifty foot construction setback line. Said revision did not reimpose the restrictions on Homestead's tract.
After selling to the Department in 1965, Homestead undertook to obtain unanimous consent of the owners in Ponchitowala Subdivision, required by LSA-C.C. arts. 729 et seq., to immediately remove the residential restrictions affecting its property. This endeavor proved unsuccessful. Thereafter, on June 24, 1970, Homestead secured the requisite signatures to a document to effect termination of all restrictions on its property pursuant to LSA-R.S. 9:5622(B). Said document, recorded June 26, 1970, one year before the present taking, recites that all restrictions on the property are terminated as of November 7, 1974, or such earlier date as may be possible in conformity with the applicable statute which provides:
"B. Stipulations in deeds and title to land providing for building restrictions which are inserted in pursuance of a general subdivision plan devised by a common ancestor in title to establish certain use and building standards, constituting covenants running with the land, and wherein no provision is made for terminating the effective date of said restrictions, may be terminated in the following manner:
(1) By agreement of owners of a majority of the square footage of land in said subdivision to terminate and end said restrictive covenants as of a definite date, provided said agreement will not be effective unless said restrictive covenants will have been established a minimum of 15 years prior to the date of termination of said restrictive covenants; and,
(2) Any agreement purporting to comply with this statute shall be recorded in the conveyance and mortgage records of the parish in which the land is located.
The Department argues that removal of the restriction does not become effective until 1977, fifteen years after the 1962 revision, which is six years following this present taking in 1971. This time element, according to the Department, renders the property's use for commercial purposes so remote as to make such potential use conjectural and speculative. On this basis, it is urged that payment may not be made on the premise that best and highest use is commercial. We believe that no practical distinction can be shown between restrictions privately imposed by deed and those resulting from governmental regulations.
It is well settled that potential use of condemned property may be deemed its best and highest use for purposes of evaluation, where there is reasonable expectation that property may be so utilized, developed or employed in the not too distant future. Plaquemines Parish School Board v. Miller, 222 La. 584, 63 So.2d 6; State, Department of Highways v. Talbot, La. App., 200 So.2d 97.
Where potential use is reasonably prospective, or reasonably certain to the extent that such use is removed from the realm of guesswork, speculation and conjecture, such potential use may be considered the best and highest use for fixing value in an expropriation proceeding. Central Louisiana Electric Company v. Harang, La.App., 131 So.2d 398, and authorities therein cited.
*772 It is also settled that zoning restrictions must be given serious consideration in determining whether a higher potential use than that allowed by zoning laws may be ascribed to a property condemned for public purposes. City of Monroe v. Nastasi, La.App., 175 So.2d 681; City of Monroe v. Carso, La.App., 179 So. 2d 696; Recreation and Parks Commission v. Drago, La.App., 247 So.2d 908. These same authorities hold that where there is a reasonable possibility of change to a higher zoning classification, said higher classification may be employed as the best and highest use of condemned property for purposes of evaluation. City of Monroe v. Nastasi, above; City of Monroe v. Carso, above; Recreation and Parks Commission v. Drago, above.
We find that pursuant to the pertinent statute, the residential restriction affecting Homestead's property is terminated as of November 7, 1974, fifteen years after its recordation. We so hold because we view the statute as permitting the termination of restrictions singly or collectively, the effective date of each such termination being reckoned from the recordation date of the instrument creating or imposing the restrictions.
The revision of restrictions filed May 2, 1962, is of no consequence in this instance because it did not relate to use purposes and did not impose a restriction on use.
We also find that abolition of said restriction three and one-third years following the date of taking does not render prospective commercial use of Homestead's property so remote and uncertain as to be speculative and conjectural. Here there is more than a reasonable expectation of change. In this case, it is certain that the property may be used for commercial purposes within a period reasonably prospective in time.
The Department also contends that even though a lifting of the residential restriction is shown, Homestead may not recover for potential commercial use because the record shows no commercial use may be made of the property after this present taking. This argument is premised on the fact that three of the four experts agreed the remainder is best suited for residential use after the taking. They so found because they deemed the remainder unsalable as a service station site due to its lack of access to U.S. 190. The answer to this argument lies in the fact that, but for this taking, the property would beyond doubt have become a prime service station site within a reasonably prospective period. This taking, however, effectively and irrevocably eliminated this reasonably certain higher use. We find that Homestead is entitled to compensation based on valuation of its site as prime service station property. This conclusion is likewise the basis for our subsequent affirmation of the severance damage awards given by the court below.

THE REVERSION FACTOR ADVANCED IN HOMESTEAD'S CASE
Because of the building restrictions and recorded cancellation thereof affecting Homestead's property, the Department's appraisers, Edward J. Deano, Jr. and Henry B. Breeding, discounted their appraisals using a factor of 0.7744. They reached said factor by using an 8% compounded rate of return to determine the present value of one dollar three and one-third years subsequent to the date of taking. They theorized that, since the Homestead property could not be used commercially for three and one-third years after the taking, a buyer would pay only 77.44% of the value at the time of condemnation. Homestead countered this theory by introducing evidence of appreciation in value which occurred independently of the taking and which more than offset the discount or reversion theory utilized by the Department's appraisers. The trial court held, and we agree, that if the reversion factor must be considered, appreciation in value *773 must likewise be noted. The record also establishes that properties of this nature are acquired by major oil companies well in advance of the completion date of improvements. This is amply demonstrated by the purchases of Gulf and Shell in May, 1966, and August, 1967, long prior to completion of subject project. In this regard, we note judicially that, as of this writing, the project has not yet been completed and opened to the public. The Department alludes to cancellation of Humble's extended option to purchase Homestead's tract as evidence that the discount factor should be employed because it demonstrates that oil companies will not purchase property which cannot presently be used for gas station purposes. We note, however, that two other operators, Gulf and Shell, purchased similar sites well in advance of project completion date. One of said purchasers, Shell, acquired a "second off" site, a location less desirable than Homestead's "first off". Additionally, testimony of Homestead's experts is to the effect that, as a general rule, major oil companies purchase such sites as soon as possible after project plans are finalized and made public because prices for such locations inevitably increase with the approach of project completion date.
We find that the trial court correctly rejected the Department's contention that the commercial value of Homestead's property should be discounted because of the alleged reversion factor.

VALUATION OF HOMESTEAD'S TRACT
Prior to this taking, Homestead's tract measured 320 feet on 190 by a depth of 290 feet on its north line along Ponchitowala Drive, a depth of 350 feet on its south line and 220 feet across the rear, containing 81,354 square feet. The Department took a strip across the entire frontage by a depth of 184 feet on Ponchitowala Drive and a depth of 263 feet along the south line; its rear line measuring 251 feet. The part taken embraces 59,256 square feet. Homestead has a remainder fronting 251 feet on the service road parallel to 190, and 105 feet along Ponchitowala Drive. Said remainder is 86 feet deep on its south line and 220 feet wide across the rear line. It contains 22,098 square feet.
The Department's appraisers, Edward J. Deano, Jr. and Henry B. Breeding, valued the tract as commercial property before the taking, but without inclusion of the enhanced value resulting from the diamond interchange. Deano appraised the whole at $36,610.00, which he discounted at 0.7744, giving a present value of $28,350.00. He found the part taken to be worth $26,655.00, to which he again applied the aforesaid discount factor thus arriving at a present value of $20,650.00. He found the after taking highest and best use to be multi-family or light commercial and industrial, which he valued at 35¢ per square foot or $5,990.00. By subtracting the value of the part taken from the present value of the whole before the taking, Deano determined the indicated value of the remainder to be $7,700.00. From this, he subtracted the market value of the remainder and found severance damages to be $1,710.00, reaching a total award of $22,360.00.
Breeding valued the property at 50¢ per square foot before the taking, or $40,677.00, which he discounted to $31,500.00. He found the part taken to be worth 50¢ per square foot, or $20,234.00, again using his discount factor. Breeding concluded the highest and best use of the remainder was residential, having a value of 30¢ per square foot, which valuation he did not discount. He thus found the remainder actually worth $6,630.00. By subtracting the present value of the part taken from the present value of the whole tract before the taking, Breeding determined the indicated value of the remainder to be $11,266.00. He then subtracted the actual value of the remainder from the indicated value and computed severance damages to be $4,636.00.
*774 Homestead's appraiser, Robert L. Lobdell, divided the tract into two parcels for evaluation purposes. He considered the 215 by 200 foot parcel optioned by Homestead to Humble to be prime service station property, to which he assigned a value of $3.00 per square foot, based on transactions involving other prime service station sites at subject intersection and similar interchanges in the vicinity. The remainder of the parcel was valued by Lobdell as other lands having a value of 25% of the prime service station part, or $.75 per square foot. Lobdell found a before taking value of $157,766.00 for the whole; an after taking value of $4,420.00, resulting in a difference of $153,346.00. The part taken was valued by Lobdell at $138,942.00, indicating severance damages of $14,404.00, and total compensation of $153,346.00.
Frank Patecek, appraiser for Homestead, considered the entire parcel as a prime service station site. Using three of the same comparables employed by Lobdell, Patecek valued the entire tract at $2.24 per square foot, or $182,235.20, before the taking. The remainder he valued at $.15 per square foot, or $3,314.77, based on an after taking residential best and highest use, and thus found a difference in value of $178,920.43. Patecek valued the part taken at $132,734.55, with resulting severance damages of $46,185.88. He thus found total compensation due in the amount of $178,920.43.
The trial court accepted the appraisals of Lobdell and Patecek as well reasoned, and disregarded the appraisals of Deano and Breeding because the latter deliberately excluded the enhanced value resulting from the initial taking. Accordingly, the trial court adopted Lobdell's appraisal, and awarded Homestead $138,942.00 for the land taken and $14,404.00 as severance damages, a total of $153,346.00, subject to credit for the sum of $11,851.00 deposited by the Department. Under the circumstances, we find no error in this award.

THE TIME INCREASE FACTOR
Lobdell and Patecek both used time increase factors varying between 8% and 12% annually in adjusting their comparables to arrive at the valuations for the subject tracts. They both testified that recorded transactions in St. Tammany Parish showed that properties in the parish, especially those situated along 190 in the area between Chinchuba and Covington, have at all times material to this case consistently increased in value at the average of approximately one (1%) per cent per month. The Department concedes such increases until 1969, but complains that there is no proof of continued annual increase between 1969, and the taking in 1971. In addition, the Department urges that the trial court erred in considering sales made after the date of taking as evidence of increase in value during the disputed 1969-1971 period. Also the Department relies upon our recent decisions in State, Through the Department of Highways v. Covington Interstate, Inc., La.App., 295 So.2d 828, and State, Through the Department of Highways v. Wax, La.App., 295 So.2d 833, writs denied September 18, 1974, both of which involved takings for this same project. Both said cases affirmed the trial court's rejection of the allowance by landowners' appraisers of a time increase factor for the period 1969-1971. The decisions in the cited cases were based on their records before us. In both instances, it was found that there was no proof of such increase in the record. In this instance, a different conclusion was reached below. It remains for us to determine whether there is evidence to support this finding.
In support of their awarding of an increase in value based on passage of time, Lobdell and Patecek used sales and resales of the same tracts, which criteria is conceded to be the best evidence of time increase in value. Using numerous transactions, these appraisers found increases ranging from 11.76% to 720% per year in transactions antedating the taking. They *775 also found several sets of transactions, some of which occurred after the taking but before trial, which demonstrated annual increases ranging from 14% to 330%. The Department complains that sales made after the date of taking should not be considered in fixing value of condemned property. Although sales made after a taking may not be used to fix market value at the time of condemnation, such transactions are properly considered in support of an appraiser's finding of an annual increase in value antecedent to the taking. See State, Through the Department of Highways v. DeRouen, La.App., 228 So.2d 659. Based on the record before us, we find ample support therein for the trial court's award of the time increase factor in these cases.
The judgment of the trial court is affirmed. The Department shall pay all costs for which it may be legally assessed.
Affirmed.