321 So.2d 388 (1975)
STATE of Louisiana, Through the DEPT. OF HIGHWAYS
v.
The SOCIETY FOR the PROPAGATION OF the FAITH et al.
No. 10353.
Court of Appeal of Louisiana, First Circuit.
June 30, 1975.
Writ Refused October 22, 1975.
Johnie E. Branch, Jr., and William W. Irwin, Jr., Asst. Gen. Counsel for Highway Dept., Baton Rouge, for appellant.
William J. Jones, Jr., Covington, and Thomas A. Rayer, New Orleans, for defendants-appellees.
*389 Before LOTTINGER, COVINGTON and BAILES, JJ.
LOTTINGER, Judge.
This is a highway expropriation proceeding, two suits having been filed by the Department of Highways against the Society For The Propagation Of The Faith Of The Archdiocese Of New Orleans, Inc. The other suit bears Number 10,354 on the docket of this court. Both suits will be considered in this opinion, however, separate judgments will be rendered.
These consolidated cases involve two I-12 takings by the Highway Department from the Society, the first taking occurred on March 24, 1969 when it expropriated 91.932 acres of the Society's lands.
A part of the land in the first taking was expropriated for the planned U.S. 190, I-12 diamond design interchange. The Highway Department later changed the design of this interchange to a larger clover-leaf design necessitating the second expropriation suit filed on September 8, 1971, which expropriated an additional 34.203 acres.
The trial court's judgment, from which the State has appealed, awarded the following amounts for the takings:

 FIRST SECOND COMBINED
 TAKING TAKING TAKINGS
 TOTAL AWARD $469,755 $629,622 $1,099,377
 DEPOSIT BY STATE 241,304 251,475 492,799
 ________ ________ __________
 INCREASED AWARD $228,451 $378,147 $ 606,598

Five appraisers testified, two on behalf of the Department and three on the behalf of the Society. The appraisers were Edward Deano and Darrel Willet for the State. The appraisers for the Society were Frank Patecek, John Lejeune and Kermit Williams.
In its reasons for judgment, the lower court said:
"The first taking contemplated a diamond design interchange. The second taking resulted when the plans were changed to a cloverleaf design interchange.
This is significant for several reasons. The first is that the intersection of highway, such as US 190, with an interstate highway using a diamond design requires less land than a clover-leaf. The second taking was made in order to make US Highway 190 a control-of-access south of its intersection with I-12.
This Court understands that the joining of two control-of-access highways requires a clover-leaf design, and that a diamond design will not work. Highway 190 is to be four lane, but not control-of-access, north of I-12. South of I-12 it is control-of-access to the Lake Pontchartrain Causeway, as well as four lane.
Prior to the taking, the property was in excess of eleven hundred acres. It is bordered on its extreme west by about sixteen hundred feet of frontage on the big Tchefuncte River at an area which is locally known as Three Rivers. Upstream the Abita River has gone into the Bogue Falaya River and at this point the Tchefuncte River joins the Bogue Falaya River at what is known as Three Rivers. The property at the river is high and outstanding. There is a small amount of river frontage that is low, but most of it is probably the highest part of *390 the Tchefuncte River between Covington and the Lake Pontchartrain.
Its southern boundary has more frontage on the Tchefuncte River but different in character in that it is low. The south boundary of the property, in addition to the approximately 900 feet of frontage on Tchefuncte River, is approximately two miles along the meanderings of Ponchitolawa Creek which is navigable for most of its length although not of the size of the Tchefuncte River. Yachts of large size come up the Tchefuncte River as far as where this property is, but only small pleasure-type boats can and do use the Ponchitolawa Creek. Also there is additional frontage of water on a small bayou called Bayou Monga, small but also navigable which traverses the southwestern part of this property.
The highway is interesting. The property had approximately thirty four hundred feet of uninterrupted highway frontage on the west side of US 190 from Ponchitolawa Creek on the south running thirty four hundred feet north. There are then several intervening ownerships and several small tracts with frontage on highway 190.
The first taking went all the way through the property from its western river frontage to the eastern US 190 edge, but it left the landowner with a good portion of valuable frontage on US 190.
The second taking consumed almost all of the defendant landowner's US 190 frontage.
In addition to these roads which I have mentioned, a state or parish maintained black top road known as Ruhl Road, or Three Rivers Road, cuts through this property about a quarter of a mile of its western boundary and, therefore, from the description which I have just given, the property has been treated by all of the appraisers as really being three separate distinct types of land.
The forty acres or so on the extreme west is classified as estate type river frontage, very, very high in value, very limited supply of it, and a great demand for it.
On the eastern part of it on US Highway 190, the appraisers went back an arbitrary distance of seven hundred, seven hundred fifty or eight hundred feet and computed an area roughly four thousand feet on the road by seven hundred fifty feet or so deep of about sixty acres, and they called that high grade commercial. Then the portion bounded on the south by the creek, on the west by Ruhl Road, on the north by a section line, and then on the east by no highway frontage, they called interior land. All of the appraisers treated it in that fashion.
The landowner used Mr. Frank Patecek, Mr. John Lejeune, and Mr. Kermit Williams as expert appraisers. The Highway Department used Mr. Edward Deano and Mr. Darrel Willett as their expert appraisers.
For the first taking, the appraisals were as follows:

March, 1969 Taking
 Patecek Lejeune Williams Deano Willett
Commercial 13,068p/a 12,256p/a 13,000p/a 8000p/a 7500p/a
 28¢ per sq. ft.
 -----------------------------------------------------------
River 10,500p/a 12,000p/a 11,500p/a 4000p/a 3500p/a
 -----------------------------------------------------------
Interior 1,800p/a 1,750p/a 1,500p/a 1000p/a 875p/a
 -----------------------------------------------------------

*391 The Court found all of the appraisers to be thorough. This Court's conclusions are to follow Mr. Williams' opinions of $13,000 per acre for the commercial land; $11,500 per acre for the river front land; and $1500.00 per acre for the interior land.
For the second taking the appraisals were as follows:

September, 1971 Taking
 Patecek Lejeune Williams Deano Willett
Commercial 18,295p/a 15,933p/a 16,000p/a 8000p/a 7,950p/a
 -----------------------------------------------------------
River 13,598p/a 12,000p/a No value 4000p/a 3,710p/a
 -----------------------------------------------------------
Interior 2,331p/a 1,750p/a 1,800p/a 1000p/a 928p/a
 -----------------------------------------------------------

No river front land was taken in the second expropriation.
All of the landowner's appraisers testified to increases in value during the thirty months which elapsed between the first and second takings. Mr. Willett, one of the State's appraisers, also found value increases during this period. Mr. Deano was the only one of the five appraisers who testified to no increases at all during this two and one-half year period.
The Court finds reasonable, and will accept, Mr. Williams' conclusions of $1800.00 per acre value for the interior land, and $16,000.00 per acre value for the commercial front land.
The second taking consumed 12.977 acres of interior land and 21.226 acres of commercial land. As stated above, the Court accepts Mr. Williams' figures.
After the second taking that portion of the landowner's property which was formerly highway frontage is behind a control of access fence with no frontage road on the 9.893 acres remaining in the northwest quadrant. The Court accepts the proposition that the highest and best use of this property (9.893 acres) has reduced from commercial at $16,000.00 per acre to residential at $1800.00 per acre, and the damages for that land are $14,200.00 per acre.
The land remaining in the southwest quadrant has also been damaged because it is behind the control of access fence, and the nearest access via the service road is a mile and a quarter south. The Court concludes that this area (stipulated to be 8,885 acres) has also been reduced to residential use, just as the land in the northwest quadrant, and it is therefore damaged in the same fashion.
With respect to the fees of the landowner's experts, the Court concludes that by and large, they are reasonable, although certainly not cheap.
For example, Mr. Champagne, the engineer and surveyor, obviously did a great amount of work. His maps of the entire tract were used throughout the whole trial.
The real estate appraisers, also, did a tremendous amount of work in both of the takings, and therefore their fees, although high, are in this Court's opinion properly due to the landowner as costs of court."
In suit no. 29940 the lower court awarded judgment in favor of defendant and against petitioner in the sum of $469,755.00 as compensation for the parcels expropriated, subject to a credit of $241,304.00 being the deposit by the Highway Department in these proceedings, together with legal interest on $228,451.00 (the amount the total award exceeds the deposit) from March 24, 1969 (the date of the expropriation) until paid, together with all costs.
*392 In suit no. 34-898, the Lower Court awarded judgment in favor of defendant and against petitioner in the sum of $362,974.00 as compensation for the parcels expropriated plus $266,648.00 as severance damages, for a total award of $629,622.00 subject to a credit of $251,475.00, being the deposit in these proceedings, together with legal interest on $378,147.00 (the amount the total award exceeds the deposit) from September 13, 1971 (date of expropriation) until paid, together with costs. The Lower Court also awarded expert fees.
The petitioner has taken an appeal in both of the cases while the defendant has neither appealed nor answered the appeal.
The defendant has cited 6 expropriation cases of property at or near this interchange (US 190-I-12) which have been reviewed by this court, namely, State Department of Highways v. Beatty, 288 So.2d 900 (1973); State Department of Highways v. Wax, 295 So.2d 833 (1974); State Department of Highways v. Covington Interstate, 295 So.2d 828 (1974); State Department of Highways v. St. Tammany Homestead Association, 304 So.2d 765 (1974); State Department of Highways v. Gulf Oil Corporation, 304 So.2d 775 (1974); State Department of Highways v. Shell Oil Company, 304 So.2d 777 (1974).
We find no error on the part of the Lower Court in adopting the valuation set forth by appraiser Williams.
In State, Department of Highways v. Wax (Supra) as well as in others of the cases above mentioned, we held that it is well settled in our law that where the experts differ, the trial judge is in a better position to determine the credibility and the weight to be accorded their testimony and his decision as to the valuation of property should not be disturbed unless shown to be manifestly erroneous.
The petitioner also complains that the Lower Court erred in considering damages on a "cost-to-cure" approach. In State, Department of Highways v. Wax (Supra) we said:
"As stated in State, Department of Highways v. Neyrey, 260 So.2d 739 (La.App. 4 Cir. 1972), the usual method of determining severance damages is the "before and after" test, but in considering applicability of the "cost to cure" method of determining severance damages, the Court said:
`However, under certain exceptional circumstances the `before and after test' will not adequately compensate the owner for his damage and the courts will resort to the `cost to cure' method of computation, not for purpose of restoration, but to gauge the diminution in market value as would be reflected in a lower purchase price that a well-informed buyer would be willing to pay. The case of State, Department of Highways v. Mason, 254 La. 1035, 229 So.2d 89 (1969), stands for the proposition that the `cost to cure' concept should be used in assessing severance damages only in most exceptional situations . . .'
". . . The rationale justifying this method of computation is that a well-informed buyer would pay less than market value for the property by a sum equal to the amount of the award, this being the cost necessary to overcome the deficiency created by the taking, i.e., the loss of access. Thus, it is only in this way that the owner of the property is fully and fairly compensated for his loss.' * * *
We agree with the trial court that the facts of this case necessitate the use of the "cost to cure" method as the only equitable way by which to measure the defendant's losses. Accordingly, the award of severance damages decided below will be upheld."
The petitioner also complains of the award of severance damages by the lower court. Certainly the contemplated project would cause severance or consequential *393 damages to defendant. Under almost identical circumstances this court granted severance damages in State Department of Highways v. Beatty, (Supra) and State Department of Highways v. Covington Interstate (Supra).
In the Beatty case we said:
"Regarding the statutory provision that severance damage should be determined as of the date of trial (R.S. 48:453), the Third Circuit said in State Department of Highways v. William T. Burton Industries, 231 La. 360, 219 So.2d 837 ((La.App.) 1969):
"`In our view, however, the provision that severance damages be valued as of the date of the trial was statutorily intended to specify that the damages the remainder suffers should be reduced by special benefits which result to it from the completion of the highway construction, not to deprive the landowner of compensation for damages sustained by his tract because of any general increase in the value of land between the taking and the trial. We do not believe that the legislature intended to deprive a landowner of damages to his property undoubtedly caused him by the taking, simply becausein the long interval between the taking itself and the subsequent completion of the long-term major highway construction projecthis property had increased in value due to generally improved economic conditions, along with all land in the area (and, probably, most other lands in the entire State).
"`"The landowners" damages should not be offset by such a general appreciation in value, any more than it is by general benefits the tract receives because of the improvement. As stated by the Grey decision, cited above "* * * the citizen whose property is taken cannot be compelled to bear more of the cost of the public improvements and general benefits resulting therefrom than is borne by other property owners whose property is neither taken nor damaged for the public purpose." (Louisiana Highway Comm., 197 La. 942) 2 So.2d (654) 660.'"
We feel that the award of the lower court was fair and just and we find no error in its decision.
For the reasons hereinabove assigned, the judgment of the lower court will be affirmed, all costs of this appeal to be paid by petitioner, as permitted by law.
Affirmed.