394 So.2d 641 (1980)
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT
v.
Aldrich A. DAVIS et ux.
No. 13844.
Court of Appeal of Louisiana, First Circuit.
December 15, 1980.
Rehearing Denied February 11, 1981.
*642 Robert L. Oliver, Richard N. Burtt, Johnie E. Branch, Jr., Assts. to Gen. Counsel, Dept. of Transp. & Development, Baton Rouge, counsel for plaintiff-appellant, State of Louisiana, Dept. of Transp. & Dev.
Vanue B. LaCour, Baton Rouge, counsel for defendants-appellees, Aldrich A. Davis and Ionia W. Davis.
Before COVINGTON, CHIASSON and LEAR, JJ.
COVINGTON, Judge.
This is an expropriation suit by the State of Louisiana, through the Department of Transportation and Development, in connection with the construction of the Scotlandville Interstate By-Pass Highway, I-110, referred to as State Project No. 450-33-79, in East Baton Rouge Parish, Louisiana. The Department obtained an order under the "quick-taking" statute, LSA-R.S. 48:441 et seq., for the expropriation of a *643 tract of land owned by Aldrich A. Davis and Ionia W. Davis, made defendants herein,[1] which tract is a rectangular-shaped parcel of land containing approximately 1.80 acres, of which 1.43 acres is being expropriated. No improvements are involved. The Department deposited the sum of $14,377.00 as its estimate of just compensation for the value of the land taken. The defendants withdrew the deposited sum, and asked for $33,014.00 as the value of the land, plus $9,953.00 as severance damages.
In answer to the expropriation proceeding, the defendants placed at issue the value of the property taken and severance damages allegedly due to them.
The trial court found that the date of the taking was March 6, 1969, and the area of property taken to be 62,508.6 square feet, or 1.43 acres, leaving a remainder of 17,859.6 square feet, or 0.410 acres. The property is described as Lot 69, North Baton Rouge Subdivision, fronting 159.4 feet on the south side of Central Road, an asphalt-covered concrete roadway with curbs and gutters. After the completion of the project, the remainder will have access to a paved service road. The trial court also found that $0.50 per square foot would be just compensation, based primarily on the appraisals of the defendants' appraisers, and held that the defendants were entitled to the sum of $31,254.30, less the amount previously deposited, $14,377.00, or the additional sum of $16,877.30. The court denied severance damages, but awarded attorney's fees in the amount of $4,500.00.
In appealing from the judgment, the Department complains of the trial court's fixing of the value of the property taken in the following respects: (1) assessing the depression and restriction in the development of the area due to a runway extension at the local airport; (2) finding the property taken not subject to development; (3) accepting the landowners' appraisers in preference to the Department's appraisers; (4) failing to consider certain comparable sales offered by the Department; (5) and fixing of the amount of just compensation due the defendants at more than $0.23 per square foot.
All of the assignments of error by the Department relate to the fixing of the value of the subject property.
The defendants' appraisers, Kermit Wayne Williams and John LeJeune, were in agreement in considering that the highest and best use of the subject property was multi-family residential, which could be accommodated within the existing zoning regulations. The property was zoned A-3.1, a multi-residential zoning permitting up to four-family usage. LeJeune testified it was feasible for this property to be developed as a four-plex complex which would contain six four-plexes and one duplex, or a total of 26 rental units. W. A. Gordon appraised for the Department and was of the opinion that the property's highest and best use was for residential purposes. We find, as did the trial court, that its highest and best use was multi-family residential.
It is well settled that potential use of expropriated property may be deemed its highest and best use for purposes of evaluation, where there is reasonable expectation that property may be so used, developed or employed in the reasonably foreseeable future. Where potential use is reasonably prospective, or reasonably certain to the extent that such use is removed from the realm of guesswork, speculation and conjecture, such potential use may be considered the highest and best use for fixing value in an expropriation. See State, Department of Highways v. St. Tammany Homestead Ass'n., 304 So.2d 765 (La.App. 1 Cir. 1974), writ refused, 307 So.2d 373 (La.1975). We thus find that the Department's argument that the evidence does not support a reasonable expectation for multi-family residential use is unfounded. The expert testimony shows that under its present zoning the property could be used for multi-family residential purposes; or, if necessary, rezoning *644 could be effected without undue problems in the reasonably foreseeable future.
In Recreation and Park Commission for Parish of East Baton Rouge v. Drago, 247 So.2d 908 (La.App. 1 Cir. 1971), writ refused, 259 La. 749, 252 So.2d 452 (1971), the property was zoned A-2 (single family units only) and capable of being used as A-4 (multi-family dwellings). The court ruled that under the facts and circumstances the highest and best use was for multi-family dwellings, such use was not remote, speculative or conjectural, but rather could be accomplished within the reasonably foreseeable future. The court relied upon the cases which held that in order to ascribe a certain purpose as constituting the highest and best use to which property being expropriated may be put, it must be shown that this potential use is reasonably prospective and removed from the realm of guesswork, speculation and conjecture. See e. g., State, Department of Highways v. Brooks, 152 So.2d 637 (La.App. 2 Cir. 1963), writ refused, 244 La. 663, 153 So.2d 880 (1963).
There is a substantial difference in the opinions of the landowners' appraisers and the opinion of the Department's appraiser as to the value of the property taken, although all appraisers used the market data approach to fix the value of the property. Mr. Williams, using five comparable sales from November, 1968, to May, 1977, arrived at an estimate of $0.45 per square foot, or a total of $28,145.00.
He described his appraisal of the subject property, as follows:
"Q. Can you describe where the property is located?
A. Yes, sir. The property is better located on these maps than I could describe it, but it is in the North Baton Rouge area behind the Scotland School and across from the Community Center. It is on Central Avenue. It is zoned A-3, which is suitable for four-plexes or duplexes or single family under this zoning. I think the distinct possibility is there that it could be zoned to a higher use. It is very well suited and could be used under its present zoning. At the time of this expropriation, probably some of the more favorable money on the market was for a four-plex system. I think this property was very well suited for that designation as of March of this year. However, my research indicated that the entire area has been subject to a, for loss of a better word, blight in that the development of the property has been restricted since 1969. This area was at one time restricted, because of its development, due to the impending construction of an east-west runway at the airport. Therefore, no building permits were permitted in there. Subsequent to this, the state announced its plans to build the highway, which is the subject of this expropriation, and further zoning changes were restricted by the City-Parish due to this. Therefore, property values have not increased as they might have had this property not been subject to this influx. In inspecting the property, I assumed the highest and best use for this property was for apartments, either four-plexes or larger units which could have been developed had the property been rezoned. I inspected several comparable sales and compared them to the subject property and concluded that the subject was worth forty-five cents per square foot. That is at 62,544 square foot taken for $28,145.00. The sales that I examined date back to 1968. This is the beginning of what I call the blighted influence on the property which is very much like an inverse condemnation, that is, the property owners couldn't use the property to its highest and best use due to these influences which were restricting its development. The first sale I examined is the Tri-State Developers to the Chapel Corporation in Square 29 in University Place. This square of property *645 was subsequently developed into approximately seventy units, if I am not mistaken. The property sold for seventy thousand dollars for 48.6 cents per square foot. The second sale I utilized was on November 15, 1968, also from Tri-State Developers to the Heritage Corporation. This was 144,000 square feet in Square 51, University Place. It also sold for seventy thousand at 48.6 cents a square foot. In [On] June 11, 1971, Mr. Verdie F. Blake sold to Frank Leonard, Lots 17 through 24, Square 54, University Place for $14,400.00, which is 57 cents per square foot. The fourth sale I utilized is some quarter of a mile north of this subject property. It was Eugene Rogillio to the Housing Authority of East Baton Rouge Parish. This sale was consumated in 1976 for a 5.15 acre tract and indicates $1.25 per square foot. The sale was $265,412.00. Upon seeing this sale, I went into a very deep investigation into the property and discussed it with the Housing Authority people, namely Mr. Diamond. Mr. Diamond told me this was an arm's length transaction, that they purchased the property from Mr. Rogillio and built the buildings themselves. Also included in this sale was some plans with an allowance of approximately 25 cents a square foot was made indicating a dollar a square foot for this property. The property does front on the highway, but they cannot build any closer than they have built already because of restrictions by the Housing Authority on noise pollution in proximity to the highway. The fifth sale that I examined was from Ms. Mildred Higgins to Edison Leo Paul. This sale was in 1977 of Lots 22 and 23, Square 8, Scotland Heights, for fifteen thousand dollars or $1.90 a square foot. Of the sales I have cited here, four of the five sales all developed into apartment houses. After considering them, considering their influences, I felt the subject property should have a fair market value of up to forty-five cents a square foot, sir.
Q. Do you have any impression with reference to the surrounding community insofar as those factors would have any impact on the property, any influence to the value?
A. Do you have reference, sir, to the impact
Q. Given the location of the property in reference to the community.
A. Yes, sir, I think it would be an excellent location for multi-housing as evidenced by the fact the Housing Authority is very near here. It is near the Community Center and has it straight across the street. Also there is a school very near. There is transportation. Utilities are available to the property. It is an excellent property for development.
Q. I show you what I have marked as P-1 for identification at this time and ask you if that is the report you prepared in reference to this appraisal?
A. Yes, sir, this is the report dated May 4, 1979. It is signed by me and has the sales I used, the value conclusions and my signature.
Q. Are there any photographs of the property in there?
A. Yes, sir, I do.
Q. Can you tell usdid you personally take those pictures or what?
A. Yes, sir, I did.
Q. Do you know approximately when you took those pictures?
A. Either in early May or right at that time.
Q. And you indicated by the pictures the direction which you were viewing?
A. Yes, sir, there are street scenes as well as a picture of the Community *646 Center across the street and, of course, the subject property.
Q. And is there
A. The subject property, as shown here, is clear, very little trees, ready for development. The community center is right across the street which I think would compliment the property in that they have social functions there and several community institutions.
Q. Did you give any attentionDo you know if this is a whole taking or a partial taking that you examined for?
A. This is a partial taking. There is a remainder on the rear of the property, but the maps that I have examined which you supplied, sir, would indicate that they are going to re-route Central Road and the remainder will have frontage on that road and did not feel there were any damages that would accrue. In fact, the projectif the project is constructed as shown on these maps, sir.
Q. What does the map show?
A. In my examination of the map, it showsI am looking at Sheet 39. It shows that Jones Street will be connected to a service road which will parallel the interstate and connect back into Central Road. This property will enjoy 143.6 feet of uninterrupted, unrestricted access to either Central Road or Jones Street. I don't know if that has been concluded. It will be one continuous street which will extend from the highway back to Rosenwald. I did not think there were any damages [severance].
Q. Are you saying the improvement created by that proposed plan, if it is carried out, would sufficiently enhance or add to or provide benefit to the property to offset any possible damage, equal or exceed any loss in value?
A. I think that is well stated, yes, sir. If there are any damages, I think they are offset by the original frontage that will be provided and the just compensation would be value at forty-five cents a foot for the part taken."
Mr. LeJeune, a real estate broker in Baton Rouge, Louisiana, also testified on behalf of the landowner. Using a total of 12 sales, he placed primary emphasis upon three sales and estimated the fair market value at $0.65 per square foot, or a total of $40,654.00. W. A. Gordon, the Department's appraiser, reached the conclusion that the subject property had a value of $0.23 per square foot based on three comparables.
Both Williams and LeJeune testified that there were actually few comparables near the subject property; they attributed the lack of activity to the fact that it was common knowledge that the proposed route of I-110 was to be in the immediate vicinity, which made it difficult to develop property in the area. The subject property was also in the proposed east-west runway corridor addition to Ryan Airport, which additionally helped restrict development in the area. In considering the experts' testimony, the trial judge commented that he felt "this area was depressed after it became common knowledge that the interstate would be built in the immediate vicinity."
The Department contends that the trial court committed manifest error in reaching its conclusion concerning the valuation of the subject property, complaining that the comparables used by the landowners' appraisers were not as acceptable as those used by the Department's appraiser. We find that Williams and LeJeune fully explained the comparables they used, and the factors they took into consideration in making their adjustments in arriving at their valuations. We thus consider the Department's contention without merit.
The trial judge agreed primarily with the defendants' appraisers, but made the adjustment he considered proper. We are of the opinion that this adjustment is *647 sound in reasoning and properly reflects the just compensation to which the defendants are entitled. In the trial on an expropriation case, much discretion is vested in the trier of fact in determining the weight to be given to the testimony of each of the expert witnesses. Vested with this discretion, the trial judge is not bound to wholly accept or reject the testimony of any one expert; he may base his conclusions on the collective testimony of any number of experts, as he sees fit. Furthermore, the trier of fact has the right to take factual determinations as to which of the factors relied upon by the witnesses relevantly influenced the market value. City of Baton Rouge v. Allied Chemical Corporation, 308 So.2d 295 (La.App. 1 Cir. 1975); State, Department of Highways v. Salassi, 244 So.2d 871 (La.App. 1 Cir. 1971).
The more reliable and approved method for determining the fair market value of property taken is to consider comparable sales, adjusting them to compensate for their relative good and bad features with regard to the property expropriated. See State, Department of Highways v. Komano, 343 So.2d 222 (La.App. 1 Cir. 1977); State, Department of Highways v. Kornman, 336 So.2d 220 (La.App. 1 Cir. 1976).
We have thoroughly studied the appraisals and testimony of each appraiser, and conclude, as did the trial court, that the landowners' appraisers' reports and testimony are more convincing than the Department's as to the value of the property taken.
We believe that the trial court's determination is supported by the evidence and that there has been no abuse of discretion. See State, Department of Highways v. Browning, 315 So.2d 784 (La.App. 1 Cir. 1975).
We affirm, at Appellant's cost.
AFFIRMED.
NOTES
[1] The defendants are erroneously referred to as Ardrich A. Davis and Sonia W. Davis in the petition.