433 So.2d 809 (1983)
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION & DEVELOPMENT
v.
Ray A. TYNES, et al.
No. 82 CA 0240.
Court of Appeal of Louisiana, First Circuit.
May 17, 1983.
*810 Bryan Miller, Johnie E. Branch, Jr., Baton Rouge, for plaintiff-appellant.
Leslie D. Ligon, Jr., Clinton, for defendants-appellees.
Before COVINGTON, LEAR and LANIER, JJ.
*811 LEAR, Judge.
On June 11, 1979, the State of Louisiana, through the Department of Transportation and Development (State), filed a petition pursuant to the Quick-Taking Statute (La. R.S. 48:441 et seq.) to expropriate certain property from the Estate of Lorene Meyer Tynes, Ray A. Tynes, Merlin Tynes and Helen Tynes (Tynes Group) to build a new bridge over the Amite River at Grangeville in East Feliciana Parish, Louisiana. The State deposited into the registry of the court $27,894.00 for the value of the land and improvements taken and $1,357.00 for severance damages, for a total deposit for just compensation of $29,251.00. The Tynes Group withdrew the amount deposited in the registry of the court, answered the State's petition and filed a reconventional demand for $615,276.00. The trial court awarded the Tynes Group $75,817.65 for the value of land and improvements taken, $125,947.78 for severance damages and $94,069.39 for business losses, for a total just compensation award of $295,834.82. The trial court also awarded to the Tynes Group an attorney fee of 25% of the difference between the amount awarded and the amount deposited in the registry of the court ($66,645.96), granted legal interest from date of the judgment until paid, and cast the State for all costs which could be legally assessed against it.[1] The State took this suspensive appeal. The Tynes Group answered the appeal and sought legal interest on the excess award from the date of expropriation, rather than from the date of judgment.
The Tynes' property at the time of the taking was a rectangular tract of land containing approximately 29 acres. This tract was divided into two parts by Louisiana State Route 37. The northern part contained 17.284 acres and the southern part contained 11.989 acres. Both parts had frontage along the Louisiana 37 right-of-way and the Amite River. The State expropriated two strips of land along each side of the La. 37 right-of-way. The portion taken in the northern tract contained 2.284 acres and that in the southern tract contained 4.589 acres. After the expropriation, 15 acres remained in the northern tract and 7.4 acres remained in the southern tract. The State took a total of 6.873 acres, leaving 22.4 acres in the original tract.
The proper measure of just compensation in expropriations by the State is set forth in State Department of Highways v. Bitterwolf, 415 So.2d 196, 199 (La.1982), as follows:
Property cannot be "taken or damaged" by the state or its political subdivisions except for public purposes and with "just compensation" paid to the owner or into court for his benefit. La. Const. 1974, Art. 1, § 4. In every expropriation, the owner must be compensated to the "full extent of his loss." Id. Thus, our constitution does not simply require that the owner of condemned property be compensated with the market value of the property taken and severance damages to his remainder, but that he be "placed in as good a position pecuniarily as [he] enjoyed prior to the taking." State v. Constant, 369 So.2d 699, 702 (La.1979). See Note, Expropriation: Compensating the Landowner to the Full Extent of His Loss, 40 La.L.Rev. 817 (1980).
The trial court placed a value of $23,950.00 for the value of the improvements expropriated on the Tynes' property. The State did not challenge this award. In any event, a review of the evidence shows that this award is not clearly wrong. State, Department of Highways v. LeBlanc, 388 So.2d 412 (La.App. 1st Cir.1980).
At the trial, testimony was received from four expert appraisers: two for the State (Craig Thomas and David Pourciau) and two for the Tynes Group (John Lejeune and Kermit Williams). The market value assigned by each appraiser to the 6.873 acres of land taken by the State is as follows:

*812
1. Thomas - $16,550
2. Pourciau - $20,631
3. Lejeune - $30,939
4. Williams - $60,903

Thomas and Pourciau found that the highest and best use for the northern tract was as batture and for the southern tract as sand and gravel mining. Both used the "cost approach" of analyzing comparable sales as the proper method for determining market value. This approach was rejected by the trial court because the "... comparable sales offered involve a great amount of speculative adjustment due to the differences in shape and depths of the properties, types of sand and gravel and their respective proportions of volume and quality, and market advantage."
Lejeune found that the highest and best use for the northern tract was for campsites. He found that the highest and best use for the 4.589 acres taken in the southern tract was for recreational/commercial, and for the remaining 7.4 acres for mining sand and gravel. Lejeune valued the campsite land taken in the northern tract by analyzing six comparable sales to arrive at an estimated value of $3,500.00 per acre. For the 4.589 acres of recreational/commercial land taken in the southern tract (including the 1.4 acres on which the Tynes' store was located), he assigned a value of $5,000.00 per acre. On the remaining 7.4 acres in the southern tract suited for mining, he assigned a value of $23,554.00 per acre based on an estimated 830,000 cubic yards per acre at 21¢ per cubic yard. Lejeune determined the value of the land taken at 2.284 acres at $3,500.00 per acre ($7,994.00) plus 4.589 acres taken at $5,000.00 per acre ($22,945.00), for a total value of $30,939.00.
Williams determined that the highest and best use for the property in both the northern and southern tracts was mining. He adopted the income capitalization approach to determine the value of the land. Williams estimated that the northern tract had 8.84 acres available for mining, with reserves of approximately 570,000 yards of marketable sand and gravel, and that the southern tract had 10.259 acres available for mining, with reserves of 660,000 yards. By considering similar mineral leases, Williams arrived at a fair market value of 22¢ per yard for the material, with an estimated increase of 2¢ per yard every year. By prorating these reserves over a ten year sales period and discounting at 10% to derive the present worth of future income, Williams arrived at the following values:

570,000 yards (sold over 10 yrs.) $105,611
660,000 yards (sold over 10 yrs.) $122,402
 ________
Value of properties income producing
 ability $228,013

Williams determined that the reversion of the 29.829 acres in ten years would have a value of $1,500.00 per acre, discounted for the present worth of future money or $16,527.00. Thus, the total value of the land was $244,540.00 ($228,013.00 + $16,527.00) or $8,198.00 per acre. From these calculations, Williams estimated that the land taken was valued at $60,903.00 (7.429 acres taken @ $8,198.00 per acre).
The trial court accepted Lejeune's opinion that the highest and best use for the 1.4 acres used for the Tynes' store was commercial, adopted his value of $5,000.00 per acre for this portion of the tract, and awarded $7,000.00 for this part of the expropriation. The trial court rejected the use of comparable sales in determining the value of the remaining 5.473 acres taken and adopted the income capitalization approach utilized by Williams of $8,198.00 per acre to fix its value at $44,867.65. The total value assigned by the trial court for the land taken was $51,867.65.
The State contends that the trial court committed error by rejecting the market value approach (comparable sales) and accepting the income capitalization approach.
In computing market value of property taken, appraisers utilize various methods of analysis, which include the determination of highest and best use, the study of comparable sales, cost and depreciation studies, and income analysis. State, Department of Highways v. Crow, 286 So.2d 353 (La.1973). This court has held that the more reliable and approved method in determining *813 fair market value of property taken is to consider comparable sales, adjusting them to compensate for their relative good and bad features with regard to the property expropriated. State, Department of Transportation and Development v. Davis, 394 So.2d 641 (La.App. 1st Cir.1980); State, Department of Highways v. Romano, 343 So.2d 222 (La.App. 1st Cir.1977). However, the use of comparable sales, although often convincing evidence, is only one of the tests to be used in establishing market value. State, Department of Highways v. Bland, 355 So.2d 283 (La.App. 2nd Cir.1978). If the study of comparables does not serve to best insure an accurate evaluation, the prime consideration of just and adequate compensation requires that courts be free to use any other method better suited to a correct assessment of value. Crow, 286 So.2d at 356.
In the instant case, the trial court rejected the comparable sales because they involved too many speculative adjustments and were unreliable for determining the value of the mining property. State, Department of Highways v. McDuffie, 240 La. 378, 123 So.2d 93 (1960). In expropriation suits, much discretion is granted to the trial court for determining what weight to be given to the testimony of an expert witness, and its findings of fact will not be disturbed on appeal unless manifestly erroneous (clearly wrong). State, Department of Highways v. Landeche, 400 So.2d 241 (La. App. 4th Cir.1981), writ denied 406 So.2d 609 (La.1981); State, Department of Transportation & Development v. Van Willett, 386 So.2d 1023 (La.App. 3rd Cir.1980), writ denied 392 So.2d 692 (La.1980); Greater Baton Rouge Airport District v. Carrick, 258 So.2d 640 (La.App. 1st Cir.1972).
There are multiple variables involved in the comparative valuation of any two given tracts. The adjustments necessary for these variables most frequently revolve around differences in time and circumstances of the sale, proximity and size of the parcels, and physical characteristics of the land. When comparisons of tracts of sand land are made, additional variables are involved such as size of the deposit, depth of overburden, types of sand and their respective proportion of volume, shape of angle of repose, and market advantage. Lafayette Airport Commission v. Roy, 265 So.2d 459 (La.App. 3rd Cir.1972), writs refused 262 La. 1159, 1160, 266 So.2d 444 (1972). After studying the appraisals of plaintiff's experts, we cannot say that the trial court's finding that "no reliable comparable sales" were offered (because of the "great amount of speculative adjustment" involved) was clearly erroneous.
In the absence of comparable sales, ascertainment of the true value of the property taken must be sought by a consideration of other methods. One such method accepted by the courts is the capitalization of income approach. Roy, 265 So.2d at 474-475; Recreation and Parks Commission, Parish of East Baton Rouge v. Loret, 263 So.2d 467 (La.App. 1st Cir.1972).[2]
Severance damages may be awarded in expropriation cases when appropriate and properly proven. In Transcontinental Gas Pipe Line Corporation v. Terrell, 416 So.2d 571, 575 (La.App. 1st Cir.1982), writ denied 421 So.2d 249 (La.1982), this court defined severance damages and the methods by which they may be calculated, as follows:
"Severance damage is any depreciation in market value of the remainder of a landowner's property caused by the taking. Such damages are recoverable and are ordinarily calculated as the difference between the value value (sic) of the remaining property before and after the taking. State, Department of Highways v. Denham Springs Development Co., Inc., 307 So.2d 304 (La.1975). The burden of proving *814 severance damages rests on the landowner, who must prove such damages with legal certainty by a preponderance of the evidence. State, Department of Highways v. Levy, 242 La. 259, 136 So.2d 35 (1961). However, there is no fixed or artificial formula by which such damages must be proved. Louisiana Power & Light Co. v. Churchill Farms, Inc., 292 So.2d 183 (La.1974). In fact, the informed and reasoned opinion of an expert, corroborated by the facts in the record, may be sufficient proof of a severance damage loss, especially where it is accepted by the trier of fact. State, Department of Highways v. Ross Continental Motor Lodge, Inc., 328 So.2d 883 (La. 1976); State, Department of Highways v. Denham Springs Development Co., Inc., supra, and cases cited therein.
"In expropriation proceedings, the trial court's factual findings as to severance damages and the evaluation of, and the weight given to, the testimony of expert witnesses will not be disturbed on review absent a showing of manifest error. State, Department of Highways v. Ruckstuhl, 348 So.2d 701, 704 (La.App. 1st Cir.1977); See Arceneaux v. Domingue, 365 So.2d 1330 (La.1978)."
The four experts determined severance damages as follows:

1. Thomas - -0-
2. Pourciau - $1,000.00
3. Lejeune - $147,326.00
4. Williams - $127,637.00

Both Pourciau and Thomas estimated that the remaining property would not be affected and that there would be no depreciation in the market value of the remainder of the land caused by the taking. Pourciau felt that the access provided was adequate for most usage, but not for heavy trucks and equipment; thus, he felt a cost to cure of $1,000.00 should be assigned to improve the accesses. Pourciau recognized that scouring would take place as a result of the project, however, he felt that the owner would have sufficient time to get most of the area mined before the scouring took place. Thomas testified that the northern tract was substantially unchanged and the southern tract was still accessable and minable.
Lejeune testified that severance damages would be due based on the accessibility problems caused by the taking. Lejeune found that the taking would not affect the northern tract and the market value would remain the same (no severance damages). He found that the southern tract had inadequate access after the taking and could only be reached by traversing the neighboring property. Based on this access limitation, Lejeune felt that the landowner was at a decided disadvantage and could only sell the southern tract for whatever would be offered him by a single potential purchaser. Lejeune assigned a value of $3,500.00 per acre for the remaining 7.4 acres (a market value of $23,554.00 per acre was assigned prior to the taking). Lejeune calculated severance damages as follows:

Value of the whole property before
 the taking -------------------------- $256,925
Value of the remainder after the
 taking ------------------------------ $ 54,400
 ________
Value of parts taken and damages ------ $202,525
Less value of part taken (land &
 improvements) ----------------------- $ 55,199
 ________
Severance damages --------------------- $147,326

Williams also found that access problems would be caused by the taking, thereby decreasing the market value of the remaining property. Williams testified as follows:
I do not think that access will provide adequate access for the commercial venture which the property had a highest and best use prior to the taking. Prior to this taking there was a large amount of unrestricted access along the north and south sides of the highway where you could have gotten in vehicles and equipment for the management of a gravel operation in both sides of the property. However, after the taking there will be a very difficult access. It will be one that a 4-wheel type vehicle or other type of vehicle like this could reach it. Therefore, it will have some value, but I do not believe it will have the same value that *815 the property enjoyed prior to the taking, sir.
Williams determined severance damages as follows:

Value Before the Taking
 Land ($8,198 per Acre × 29.829) ....................... $244,540.00
 Improvements .......................................... 22,600.00
 ___________
VALUE BEFORE TAKING ......................................... $267,140.00
Less Value of Part Taken
 Improvements .................................. $22,600
 Land 7.429 Acres @ $8,198 per Acre ............ $60,903
 _______
VALUE OF PART TAKEN ......................................... $ 83,503.00
 ___________
VALUE OF REMAINDER .......................................... $183,637.00
VALUE OF THE REMAINDER AFTER THE TAKING
22.4 Acres @ $2,500 per Acre ............................... $ 56,000.00
 ___________
SEVERANCE DAMAGES .......................................... $127,637.00

In determining whether or not severance damages were due, the trial judge, in his reasons for judgment, accepted the following testimony of Austin Smith and A.M. McConnell:
Mr. Austin Smith, an expert with outstanding credentials, testified for defendant regarding the probable course of the Amite River after completion of the new bridge. This Court was very impressed with the testimony and credentials of Mr. Smith, who worked for over 40 years with the U.S. Corps of Engineers and who now, as a civil engineering consultant, has been recognized as an expert in numerous state and federal courts. Mr. Smith gave detailed testimony as to erosion of the remaining Tynes' property after completion of the bridge. His conclusions were that the river would travel in a westerly direction in an effort to straighten its course and would therefore, destroy the high ground and point bar of a portion of the Tynes' property south of the bridge and immediately below where construction of bridge pilings embedded deep in the ground allowed scouring so as to not endanger support of the bridge; that such erosion would mean a depletion in gravel reserves on the property; and that there would be a loss of access to the property south of the road with a resulting restriction to mining the property because of the access problem. In regard to access, Mr. Smith could see no realistic way of maintaining an access ramp from the highway to the property south of the bridge in light of probable erosion problems caused by high water conditions along the Amite River. Mr. Smith also commented on Acme Gravel Company's application to the Corps of Engineers for a permit to mine the Tynes' property. It was shown that the Department of Transportation and Development had objected to the mining permit because such could cause a change in river hydraulics and endanger bridge security. It was Mr. Smith's opinion that the Corps of Engineers would honor the objection of the Department of Transportation and Development and not issue the permit.
. . . . .
Mr. A.M. McConnell, a retired civil engineer and land surveyor who once worked for the Department of Agriculture for 32 years in erosion control, drainage, irrigation and as Area Engineer, testified as an expert in surveying and soil conservation for the defendant in regard to the potential scouring of the river. He testified that he had worked with Mr. Austin Smith in surveying and studying the area around the bridge. In regard to the ramp constructed for access from the highway to the Tynes' property south of the bridge, it was Mr. McConnell's opinion *816 that the structure was only temporary and would not hold up, but would erode and be destroyed by any high water. Mr. McConnell also testified that it would not be economically practical to make it permanent.
Based on this evidence, the trial court made the following factual findings:
(1) the Tynes' property is a very unique piece of property which remaining value will be substantially lowered by the right-of-way expropriation and subsequent bridge construction; (2) further use of the Tynes' property will be restricted because of the fact that there will be no economically practical way of maintaining an all-weather access to the property; (3) the bridge was constructed in a manner so as to anticipate and allow movement and scouring of the river channel to the west thereby eroding the Tynes' property, and that movement of the channel and scouring will in fact occur according to the expert testimony; and (4) the fact that the Department as a matter of policy opposes any mining of sand and gravel on the similarly situated property for bridge security reasons and thus will restrict, limit or prevent the mining of sand and gravel on the property; and (5) the highest and best use of the land is commercial value as a store location on approximately one acre and for the mining of sand and gravel on the remainder. The construction will prevent those uses on the Tynes' property after the expropriation of part of the land. Thus there are severance damages to the remainder.
The factual finding of the trial court that severance damages are due is not clearly wrong.
The trial court calculated the amount of severance damages due as follows:

Value of improvements and 1.4 ac
(23,950.00 + 7,000 commercial) $30,950.00
Value of remaining expropriated land
(5.473 ac × 8198) 44,867.65
Value of remaining landnot
expropriated 148,903.78
 1.5 ac buffer @ $2500 ac.
 7.5 ac previously mined @ $4099 ac.
13.956 ac unmined @ $8198 ac.
22.956 ac. Total
 ___________
Value of whole prior to taking $224,721.43
Minus value of part taken 75,817.65
 ____________
 $148,903.78
Value of remainder after taking
(22.956 ac @ $1000 ac) 22,956.00
 ____________
 $125,947.78

The method of computing severance damages utilized by the trial court is correct. However, the trial court used the wrong total acreage in these computations and the value assigned by the trial court to the remaining land after the taking is not supported by the evidence.
The record shows that the State expropriated 2.284 acres from the north tract of the Tynes' property and 4.589 acres from the southern tract for a total of 6.873 acres. This left 15 acres in the northern tract and 7.4 acres in the southern tract for a total of 22.4 acres. The total size of the northern tract, prior to the taking, was 17.284 acres and for the southern tract, 11.989 acres for a total tract size of 29.273 acres. Pourciau and Thomas both correctly used these figures in their computations. Lejeune used 29.173 acres and his report shows that he assigned 11.898 acres to the southern tract. The figure of 29.829 used by the trial court is also that used by Williams in his report. Williams determined that 7.429 (rather than 6.873) was expropriated. There is no explanation in the record for this difference of 0.556 acres, and this figure is clearly wrong.
The trial judge assigned a value of $1,000.00 per acre to the property remaining after the taking. Williams assigned a value of $2,500.00 per acre. Lejeune assigned a value of $3,500.00 per acre to the land remaining in the 7.4 acres in the south tract and to 3 acres remaining in the north tract. For the additional remaining 12 acres in the north tract, he assigned a value of $1,500.00 per acre. Pourciau valued the 15 acres in the north tract at $1,800.00 per acre after the taking and valued the 7.4 acres in the south tract at $3,600.00 per acre after the taking. Thomas found no severance damages, and thus his valuations before the taking were the same as those after the taking.
*817 A trial court may not substitute its opinion for that of an expert witness who testified at the trial when such testimony is based on correct facts and good reasoning. Van Willet, 386 So.2d at 1029; State, Department of Highways v. Terrebonne, 349 So.2d 936 (La.App. 1st Cir.1977), writ denied 351 So.2d 166 (La.1977). The trial court, in the instant case, assigned his own value to the land remaining after the taking and, thus, substituted his opinion for that of the expert appraisers. Since the trial judge accepted Williams' appraisal for most of his findings, we will accept his value of $2,500.00 per acre as the value of the land remaining after the taking.
The trial court's computation of severance damages must be amended and adjusted to reflect the following:

Value of non-expropriated land before
 taking
 (1) 1.5 acres buffer @ $2500/acre $ 3,750.00
 (2) 7.5 acres previously mined @
 $4099/acre 30,742.50
 (3) 13.4 acres unmined @
 $8198/acre 109,853.20
 ___________
 TOTAL $144,345.70
Value of non-expropriated land after
 taking
 (1) 22.4 acres @ $2500/acre 56,000.00
 ___________
Severances Damages $ 88,345.70

The trial court's severance damages award is amended and reduced to $88,345.70.
The trial court awarded damages for business losses suffered from the taking of the Tynes' store. This amount was calculated by taking the average annual profit from the business ($15,309.39 per year) over the last nine years of its operations and discounting the total over the next succeeding ten years at 10% to arrive at the present value of profits of $94,069.39.[3]
The trial court relied on State Department of Highways v. Constant, 369 So.2d 699 (La.1979) as authority for this element of damages. In Constant, the court held that Louisiana Constitution of 1974, art. I, § 4, was intended to broaden the former constitutional concepts of measure of damages in expropriation cases by requiring that the landowner should receive an award that would permit him to retain equivalent financial circumstances after the taking. A landowner must be compensated to the full extent of his loss. An award for business losses must be based on adequate proof. State, Department of Highways v. Constant, 359 So.2d 666 (La.App. 1st Cir. 1978), amended in part 369 So.2d 699 (La. 1979).
One method of determining the value of a business loss is to determine the loss of its cash flow. Cash flows developed by a firm depends on two important factors: the firm's market and its means to deliver. Denying or significantly affecting either of these will cause the firm to suffer a loss of value. In expropriation cases, reductions of cash flows would be caused by the consequent removal of the firm from proximity to all or part of its market. Clauretie and Harju, Expropriation under Louisiana Law: "Compensation to the Full Extent of the Loss ", 30 Louisiana Bar Journal 368 (April 1983).
A firm faced with losing its present location through expropriation is considered "location-specific" when its location within or near an established market is vital. In such a situation, the options available to a firm are as follows: (1) go out of business; (2) move to an area away from its established market, with the consequent loss of some or all of its original market, offset to some extent by new market gains; (3) move its main functions to another area and preserve its market by incurring additional expense to service its former market; or (4) relocate within the immediate area and suffer no loss or a minimal loss of its established market. Id. at 370.
Option 1 involves a determination of whether the value of the firm is more or less than the fair market value of an expropriated asset taken singly. One method of determining this is by evaluating the firm's most recent income statements to arrive at *818 the firm's expected future net income. If the firm's value were found to be less than the expropriated asset, then the "fair market value" of the asset taken might very well comprise the full extent of the firm's loss; however, if the value of the firm turned out to be greater than the fair market value of the expropriated asset, one of the other three options would have to be considered. Id. at 370.
Option 4 involves a determination of replacement cost of an asset with no loss of market caused by moving the business to another location within its established market. Options 2 and 3 both involve a loss of market caused by moving the business to another location, away from its established market. Under either option, some estimate of the loss of market must be made. This can be done by surveying the firm's customers or by analyzing similar markets. Once market loss has been established, some determination of costs attendant to operating at a new location should be made. Thus, these two options involve an award for replacement cost plus something else to handle loss of market, loss of revenue or additional expense to offset such loss. Id. at 371.
The evidence showed that the location of the Tynes' store was unique, being only one of five or six on the Amite River. The Tynes Group was unable to find a similar location on the river because no one was willing to sell that type of land. The location of the business on the river gave the Tynes Group a market advantage in serving the needs of those traveling on the river, such as hunters, fishermen and boaters. However, the Tynes Group presented no evidence for the court to consider as to the loss of market which would result from moving to a new location off the river. In this regard, Merlin Tynes testified as follows: "I had customers that came off the river. Their mode of transportation would be boats and canoes. I can't sit here and tell you how much monetary value it was because I didn't keep up with it like that." (Compare Constant, 369 So.2d at 705). The Tynes' store sold groceries, liquor, gasoline and other similar items which are in demand by those not using the river as well as those that do. The Tynes Group made no effort to reestablish their store on the remainder of the property, nor did they present evidence of any market survey to show what effect such a move would have. Thus, defendants have presented no evidence as to how much of their business was attributable to river traffic, which would have been lost by conducting their business from another site. No evidence was presented to show loss of net revenue due to down time during a relocation, out-of-pocket moving expenses, or permanent loss of market caused by a relocation. The mere introduction of income tax returns is insufficient evidence to support this element of damages. In addition, no expert testimony was presented as to the proper capitalization rate (the trial court used 10%) and no such testimony was presented to support the projection of profits over a ten year period in computing present value of income.
The Tynes Group has failed to prove loss of market resulting from the expropriation. They have been previously awarded the value of the physical asset taken. The trial court's award for business losses is clearly wrong because it is not supported by adequate proof.
The prevailing party in litigation is not entitled to an award of an attorney fee unless it is authorized by statute or contract. Killebrew v. Abbott Laboratories, 359 So.2d 1275 (La.1978). La.R.S. 48:453(E) provides for an award of an attorney fee in expropriations, pursuant to the "quick-taking" statute, as follows:
Reasonable attorney fees may be awarded by the court if the amount of the compensation deposited in the registry of the court is less than the amount of compensation awarded in the judgment. Such attorney fees in no event shall exceed 25% of the difference between the award and the amount deposited in the registry of the court.
The trial court awarded the maximum attorney fee allowed by the statute of *819 25% of the difference between the amount awarded and the amount originally deposited by plaintiff in the registry of the court.[4] Defendants' attorney is clearly entitled to an award of an attorney fee, however, the statute does not require the award of an attorney fee to equal 25% of the excess award. Rather, the provisions of the statute allow for a reasonable fee not to exceed 25% of the excess award. State, Department of Transportation & Development v. Estate of Aertker, 404 So.2d 316 (La.App. 3rd Cir.1981); State, Department of Transportation and Development v. Boyce Gin Cooperative, Inc., 397 So.2d 1087 (La.App. 3rd Cir.1981). In making such an award, the trial court is vested with considerable discretion, and the award will not be disturbed in the absence of "clear abuse". Prentice Oil and Gas Company v. State, Department of Transportation and Development, 421 So.2d 937 (La.App. 1st Cir. 1982), writ denied 423 So.2d 1165 (La.1982); State, Department of Highways v. Terrebonne, 349 So.2d 936 (La.App. 1st Cir.1977), writ denied 351 So.2d 166 (La.1977). However, attorney fees are subject to review and control by the courts. Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102 (La. 1978). Therefore, it is the duty of this court to determine if the attorney fee awarded is reasonable and not an abuse of the trial court's discretion. State, Department of Transportation and Development v. Frabbiele, 391 So.2d 1364 (La.App. 4th Cir. 1980). In State v. Ransome, 392 So.2d 490, 495 (La.App. 1st Cir.1980), appears the following:
In considering reasonable attorney fees the Court must first consider these factors in awarding attorney fees, namely: (1) the ultimate result obtained; (2) responsibility incurred; (3) the importance of the litigation; (4) the amount involved; (5) the extent and character of the labor performed; (6) the legal knowledge and attainment and skill of the attorney; (7) the number of appearances made; (8) the intricacies of the facts and law involved; (9) the diligence and skill of counsel; and (10) the Court's own knowledge.
If it is determined that an attorney fee awarded by the trial court is unreasonable, this court can either: (1) remand for the purpose of permitting evidence to be offered in connection with the amount of the attorney fee to be assessed when the record does not contain any evidence to form the basis for awarding a reasonable attorney fee [State, Department of Highways v. Frabbiele, 372 So.2d 234 (La.App. 4th Cir.1979)], or (2) consider the services performed by the attorney for the defendant under the eye of the court and, after reviewing the record, fix a reasonable attorney fee [State Department of Highways v. Boudreaux, 401 So.2d 428 (La.App. 1st Cir.1981) ].
Expropriation of any individual's property, including his business, is a very important and serious matter which places a great deal of responsibility on the landowner's attorney to protect his client's rights. In the instant case, defendants' attorney took steps necessary to obtain a successful result for his clients, namely: (1) filed a motion and order to withdraw, without prejudice, the funds deposited in the registry of the court; (2) filed an answer requesting additional compensation for the property taken; (3) propounded interrogatories to plaintiff and answered interrogatories propounded to defendants; (4) obtained and deposed two experts in the field of real estate appraisal and attended the depositions of two of the State's expert witnesses; (5) called nine witnesses at a two day trial to testify on defendants' behalf; and (6) filed an appellate brief for defendants in response to plaintiff's appeal. Admittedly, all of these steps are normally required in every suit, however, consideration must be given to the uniqueness and complexity of the issues involved.
As a result of his efforts, counsel for the Tynes Group secured an increase of $134,912.35 over the amount of $29,251.00 *820 deposited in the registry of the court for a total award of $164,163.35. The trial court was of the opinion that the award should be fixed at the maximum in this case. Based on the award approved in this court, this would result in an attorney fee of $33,728.09. Considering all of the factors set forth above, we believe that the maximum amount is justified in this case.
The Tynes Group is entitled to legal interest (La.C.C. art. 2924) on the excess award from the date of expropriation (June 11, 1979) until paid. La.R.S. 48:455. The State is cast for all costs of these proceedings, totaling $7,645.01. La.R.S. 13:4521; La.R.S. 13:5112; Prentice Oil and Gas Company, 421 So.2d at 941.
For the foregoing reasons, the judgment of the trial court is amended to reduce the total amount of the award for just compensation to the sum of $164,163.35. The Tynes Group is awarded a reasonable attorney fee of $33,728.09. The Tynes Group is entitled to legal interest on $134,912.35 from June 11, 1979, until paid. The State is cast for all costs of these proceedings.
AMENDED AND AFFIRMED.
NOTES
[1] In an amended judgment, the trial court awarded "... interest and costs as allowed by law."
[2] Because we have determined that the trial judge was correct in rejecting the comparable sales to determine the proper value of the mining land taken, the cases of State, Department of Highways v. Hayward, 243 La. 1036, 150 So.2d 6 (1963) and State, Department of Highways v. Hart, 249 So.2d 310 (La.App. 1st Cir. 1971), application denied 259 La. 773, 252 So.2d 668 (1971) are not applicable.
[3] The Tynes Group introduced into evidence income tax returns for the past ten years of the store's operation. The trial court rejected the income tax return for the last year of the store's operation because the business was liquidating and not replenishing its stock.
[4] $295,834.82 (amount awarded) - $29,251.00 (amount deposited in the registry of the court) = $266,583.82 × .25 = $66,645.96 (attorney fee awarded by the trial court).